**Kenneth R. JONES et al., Plaintiffs,**

v.

**The STATE BOARD OF EDUCATION OF AND FOR the STATE OF TENNESSEE et al., Defendants.**

**Civ. No. 4887.**

United States District Court
M. D. Tennessee,
Nashville Division.

Jan. 18, 1968.

I. T. Creswell, Jr., Nashville, Tenn., Robert L. Carter and Richard Bellman, New York City, and Reber F. Boult, Jr., Atlanta, Ga., for plaintiffs.

Thomas E. Fox, Deputy Atty. Gen., Robert F. Hedgepath and Robert H. Roberts, Asst. Attys. Gen., State of Tennessee, Nashville, Tenn., for defendants.

## OPINION

WILLIAM E. MILLER, Chief Judge.

In this action the plaintiffs, Kenneth R. Jones, James Mickey Booth, and Frederick Brooks, filed their complaint on behalf of themselves and as a class action on behalf of others similarly situated, against the Tennessee State Board of

Education, Tennessee A. & I. State University, the Faculty Advisory Committee of said University, and other state and university officials and agencies, invoking the jurisdiction of the Court under 28 U.S.C.A. §§ 1331 and 1343 and under the First, Fifth, and Fourteenth Amendments to the United States Constitution. Tennessee A. & I. State University (hereinafter University) is a state supported land grant college, originally established as an institution for higher learning for members of the Negro race. Today the institution still consists primarily of Negro students, teachers, and administrators.

Plaintiffs contend that they have been wrongfully suspended or expelled from the University and that they will suffer irreparable injury unless they are readmitted. In their complaint plaintiffs make a two-pronged attack upon the action of the Faculty Advisory Committee (hereinafter F.A.C.) in ordering their indefinite suspension. First, the action of the F.A.C. is attacked on procedural grounds, it being alleged that the F.A.C. in making charges against plaintiffs and in conducting hearings deprived the plaintiffs of due process of law and of equal protection of the law. Also, it is alleged that the action was taken to discourage or punish the plaintiffs in the exercise of their First Amendment freedoms. The relief sought is a permanent injunction directing the plaintiffs' reinstatement and enjoining the defendants from interfering with the enjoyment by plaintiffs of their constitutionally protected rights.

The defendants in their answer deny that the plaintiffs were dismissed from the University as a result of plaintiffs' engaging in activities protected by the First Amendment. The defendants further deny that the F.A.C. acted in any manner which would deprive the plaintiffs of due process of law or equal protection of the law guaranteed by the Fourteenth Amendment.

The action was heard on its merits before the Court on October 16–18, 1967, and from the extensive proof the controlling facts appear without serious conflict. At the University the body having responsibility for imposing severe discipline is the F.A.C., composed of nine faculty members and administrators. On or about June 8, 1967, the F.A.C. sent telegrams to approximately seventy students, including the three named plaintiffs, in which each student was informed that he had not been cleared to continue his education at the University and stating that an explanatory letter would follow. It is the policy of the University and the F.A.C. to review the record of each student at the end of each school year. The seventy students who received the telegrams were those who had been recommended for disciplinary action during the previous school year by persons in authority.

On June 21, 1967, the explanatory letters were sent informing each of the seventy students of his indefinite suspension, specifying the reason for the suspension in each particular case, and informing each student that he would be allowed a hearing before the F.A.C. at anytime until July 15, 1967, to show cause why this action should not be taken. If the F.A.C. did not receive a request for a hearing from a student, the suspension was to be considered final.

Following the June 21 letter, considerable correspondence and negotiation ensued between the plaintiffs' retained attorney, the Honorable I. T. Creswell, Jr., who also represented other students, and various members of the University administration. Creswell first wrote on June 22 or 23 to Dr. J. A. Payne, Dean of Students, and to Dr. W. N. Boswell, Chairman of the F.A.C., requesting further information. Boswell replied on June 30 that he was referring Creswell's letter to Dr. Walter S. Davis, President of the University. Payne replied on July 12 that the letter sent to him was being referred to the Tennessee State Attorney General's office. On July 31 Creswell again wrote to Boswell requesting that the hearings be set for August 8–11, and asking for a specification of charges against the plaintiffs and against three

other students whom Creswell also represented. On August 7 Creswell sent a telegram to Boswell requesting a reply to his last letter. On August 9 Creswell wrote to the Tennessee State Attorney General, the Honorable George F. McCanless, requesting an answer to the letter that Payne had forwarded to him. This request was answered on August 10 when the Attorney General stated that he had no response to make to Creswell's letter to Payne since the dispute was an administrative matter.

On September 8 Boswell by telegram informed Creswell that hearings had been scheduled for September 9–14 and that he could appear at these hearings as plaintiffs' legal counsel. Letters to the same effect were mailed the same day to the plaintiffs and to Creswell. By request of Creswell the hearings were postponed and did not begin until September 16. The specifications of charges against the plaintiffs requested by Creswell were provided by the F.A.C. on September 14. The hearings for plaintiffs Jones, Booth, and Brooks were held before the F.A.C. on September 16, 18, and 20 respectively.

At the hearings testimony was introduced in the presence of plaintiffs. They were given an opportunity to testify, to ask questions of their accusers, and to present witnesses and other evidence in their own behalf. The witnesses were not under oath and formal rules of evidence were not invoked. A verbatim transcript of the proceedings was made, and the plaintiffs' attorney actively participated in all hearings. At each session the entire F.A.C. was present. The University was represented by the Honorable Robert H. Roberts and the Honorable Robert F. Hedgepath, Assistants to the Tennessee State Attorney General.

In the original June 21 letter sent to the seventy University students, plaintiff Kenneth Jones was charged as follows:

Involved in worm-on-plate incident in cafeteria in an alleged attempt to discredit cafeteria workers; fraud and conspiracy. Participated in riot.

The September 14 specification of charges against Jones was a much longer statement:

You are charged with conduct unbefitting a University student in that during the school year you created a disturbance in the cafeteria located within Jane E. Elliott Hall. During that time a "worm" which obviously had not been processed through the kitchen was said to have been found in some food served to one of your fellow students. Your actions on that occasion exemplify a disrespect for University authority.

You are charged with distributing literature and soliciting students, all of which was designed to boycott the registration at the University for the Fall Quarter 1967. This occurred during the summer of 1967.

You are charged with having been recently arrested by the Nashville Metropolitan Police Department at Fortieth Avenue and Clinton Road upon a charge of disorderly conduct. Pursuant to that arrest, you were convicted and fined $50.00 by the Judge of the Metropolitan City Court.

You are charged with continuous disrespect for University authority, all of which is a violation of Chapter 4, Student Handbook, "Discipline and Honor," pages 17 and 18 and Chapter 3, "Conduct," page 11.

The F.A.C., following Jones' hearing, made an explicit finding only on the second of the four charges. The report of the F.A.C. states:

We, the Committee find that Mr. Jones has seized upon the opportunity on different occasions to promote unrest on the campus by such actions as distributing literature designed for that purpose * * *.

In ordering Jones' indefinite suspension the F.A.C. also made the following general finding:

We have found from the evidence presented that the actions of Mr. Jones did constitute violations of the University's regulations governing

student conduct and behavior. Mr. Jones has not demonstrated his willingness to observe the minimum standards of propriety in conduct required here.

The June 21 letter which plaintiff Booth received charged as follows:

Arrested in raid on 1720 Jefferson Street. Charged with State warrant for inciting to riot. Printed (or caused to be printed) and passed out inflammatory papers that carried your name. Nashville Tennessean published story revealing immorality on your part.

The September 14 specification of charges against Booth stated:

You are charged with continually disrupting fellow students in their pursuit of study. Incidents have occurred within the University complex, namely, the library, etc.

You are charged with having participated, in the printing, writing, and distribution of materials of a disturbing nature designed to interfere with the orderly University life.

You are charged with having been seen by officers of the Metropolitan Police Department in bed with a female.

You are charged with having been disrespectful toward University authority in that on April 28, 1967 during a meeting of the student body for the purpose of nominating officers, you disrupted said meeting by directing your speech against said faculty members and administrative officials of the University.

You are charged with having been accused on April 12, 1967 by a fellow student, William Jackson, of having participated in a rock throwing incident on the University campus. That accusation was made in your presence at which time you refused to deny your participation.

You are charged with the unauthorized entry of a building on the University campus at which time you participated in the meeting of a certain student organization, namely, Student Representative Association, after that organization had been refused recognition by the University officials.

You are charged with continuous disrespect for the authority of the University officials, all of which is in violation of Chapter 4, Student Handbook, published by the Tennessee A. & I. State University, "Discipline and Honor," pages 17 and 18, and Chapter 3 of the Student Handbook, "Conduct," page 11.

In ordering the indefinite suspension of Booth, the F.A.C. made the following findings on the charges:

We, the Committee find that Mr. Booth was arrested by officers of the Metropolitan Police and at the time, was found in bed with a young woman. Because of the publicity given this deplorable incident he has tainted the reputation of this Institution and its students. He has passed out literature and talked and dressed himself in such a manner, particularly in and about the library, all calculated to cause unrest and disturb the other students. On April 28, 1967 we find that he disrupted a meeting of the student body and showed gross disrespect for officials of the University.

The June 21 letter which plaintiff Brooks received charged as follows:

Abusive language to faculty and administration. Public drunkenness. Participated in riot during month of April, 1967.

The September 14 specification of charges against Brooks stated:

You are charged with continually showing disrespect for University authority. You are charged with having led a group on April 12, 1967 into Kean Hall at which time a meeting was under way between University officials and students. This meeting was being conducted for the purpose of discussing grievances which the students had presented to the University officials on the previous day. Upon your arrival, you and others created a disturbance through loud talking and

other activities which caused the meeting to be disrupted.

You are charged with illegally entering a building at the University for the purpose of conducting a meeting of a student group known as the Student Representative Association, although that association had been denied recognition by University officials.

You are charged with distributing literature during the Summer of 1967 and of soliciting students all of which was aimed at organizing a boycott of the registration of students for the Fall Quarter of 1967.

You are charged with having made a verbal assault upon the President of the University during the school year 1966–1967, at which time you called him names which are not ordinarily considered proper in discussions between the President of a University and one of his students.

You are charged with having made a verbal assault upon University officials on April 12, 1967 to such a degree that other students reacted in favor of the University official.

You are charged with continuously showing disrespect for University authority, all of which is in violation of Chapter 4 of the Student Handbook published by the Tennessee A. & I. State University, "Discipline and Honor," pages 17 and 18, and Chapter 3, "Conduct," page 11.

In ordering the indefinite suspension of Brooks, the F.A.C. made the following findings on the charges:

We, the Committee find that Mr. Brooks has on at least two occasions treated the President of this Institution with gross disrespect. When on one of these occasions he was admonished by the Executive Assistants to the President concerning such disrespectful attitude, he said in effect, "Who ever heard of respect in a revolution." He was at the front of a small group that invaded a meeting between students and faculty discussing grievances the student had presented to school officials. His conduct there resulted in disrupting an otherwise orderly meeting to the point it could not be continued, showing gross disrespect, both to students and officials at the University.

In ordering the indefinite suspension of plaintiffs Jones, Booth and Brooks, the F.A.C. at the same time ruled on the cases of Calvin Connor and Robert Butler, two other University students who were also represented by Creswell throughout the period of negotiation with the F.A.C. Since Butler did not desire at the time to continue his education at the University, the F.A.C. ruled that the issues involved in his case were moot. After considering the matters presented in the case of Calvin Connor, the F.A.C. recommended that he be allowed to continue his education at the University.

In their complaint plaintiffs have attempted to make this a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The facts of the case indicate that of the seventy students who received the June 21 notice of indefinite suspension, twenty-eight notified the F.A.C. that they wanted to show cause why this action should not be taken. The F.A.C. agreed for various reasons not to suspend twenty-two of these students. This left six students, including the three plaintiffs, against whom the F.A.C. did take disciplinary action. In order to maintain a class action Rule 23 requires, among other things, that the class be so numerous that the joinder of all members is impracticable. The questions of law and fact in this case apply only to the plaintiffs and possibly to three other persons. Clearly the presence of three additional persons does not constitute a class so numerous that joinder of them in this suit would be impracticable. Brooks v. Briley, 274 F. Supp. 538 (M.D.Tenn.1967). Since a vital prerequisite of Rule 23 is not present, a class action may not be maintained in this case.

The basic issue is whether the University authorities in the exercise of their power to regulate student conduct have deprived the plaintiffs of constitutionally protected rights. The principal contention of the plaintiffs is that they were denied due process of law.

■ The right to due process of law, guaranteed by the Fourteenth Amendment, requires, among other things, that the accused be granted adequate and timely notice of the charges against him, Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), a hearing, Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), before a fair and impartial tribunal, In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), and an opportunity to produce evidence in his own behalf, Baltimore & O. R. Co. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209 (1936).

The leading case involving the application of these basic principles to a disciplinary proceeding conducted by a state supported educational institution is Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961), cert. denied 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193. The plaintiffs there had been expelled from school for participating in civil rights demonstrations. Prior to expulsion the school authorities had not definitely specified the students' misconduct nor were they allowed a hearing. The Court held that due process of law requires notice and some opportunity for a hearing before a student at a tax supported college may be expelled for misconduct. The court set forth the following standards:

> The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dressed judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impracticable to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college. In the instant case, the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given an opportunity to present to the Board, or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection. If these rudimentary elements of fair play are followed in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled.

A similar problem was presented to this Court in Knight v. State Board of Education, 200 F.Supp. 174 (M.D.Tenn. 1961). There the plaintiffs challenged their suspensions from Tennessee A. & I. State University, the same school involved in the instant case, following their participation in Mississippi freedom rides. The plaintiffs alleged that their suspensions were discriminatory and arbitrary and without notice or opportunity

to be heard and that the suspension orders were issued as a punitive or retaliatory measure for having participated in what were First Amendment protected activities. The suspensions were ordered pursuant to a State Board of Education regulation which provided for dismissal of a student who is arrested and convicted on charges involving personal misconduct. The plaintiffs were suspended after an ex parte hearing without notice and prior to the disposition of all their cases in the Mississippi courts.

This Court held that the plaintiffs' claim to a deprivation of procedural due process was well taken, but the claim that the disciplinary action was dictated as a retaliatory measure was dismissed as without merit. The Court stated that "upon the present record the rudiments of fair play and the requirements of due process vested in the plaintiffs the right to be forewarned or advised of the charges to be made against them and to be afforded an opportunity to present their side of the case before such drastic disciplinary action was invoked by the university authorities."

In Due v. Florida A. & M. University, 233 F.Supp. 396 (N.D.Fla.1963), the plaintiffs had been judged guilty of contempt of a Florida court, and without receiving prior notice they were brought before the school disciplinary committee. The only charge against them was the contempt conviction in the Florida court. The plaintiffs were for the first time advised of this charge upon appearing before the committee. The court held that the plaintiffs had not been denied due process. The disciplinary committee was duly established and organized by standard, well-defined procedure. "There was notice to each of these plaintiffs, the charges were made explicit, and each was afforded full opportunity to be heard, and, in fact, was heard to the point where each said he had nothing more to say." The court found that the basic requirements of procedural fairness had been met.

The rule of *Dixon, Knight,* and *Due* that due process of law requires notice and some opportunity for a hearing before a student at a tax supported college or university may be expelled for misconduct has now become well established. Wasson v. Trowbridge, 382 F.2d 807 (2d Cir. 1967); Woods v. Wright, 334 F.2d 369 (5th Cir. 1964); Madera v. Board of Education of City of New York, 267 F.Supp. 356 (S.D.N.Y.1967). The Tennessee Supreme Court in a much earlier case held that a student at a state supported school may not be expelled without notice and a fair hearing. State ex rel. Sherman v. Hyman, 180 Tenn. 99, 171 S.W.2d 822 (1942), cert. denied 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703. Of course, provided the procedural requirements are met, it is always within the province of school authorities to prohibit by regulations acts calculated to undermine school discipline and to punish when these regulations have been violated. Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966). Cf. Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966).

As indicated above, this Court in the *Knight* case adopted and applied the rule of the *Dixon* case to the effect that due process of law requires notice and some opportunity for a hearing before a student at a tax supported university may be expelled for misconduct. The question in this case concerns the application of this rule and the extent of the notice and hearing required to satisfy due process standards.

In asserting that they were denied due process, the plaintiffs raise a number of contentions. They assert that they were not accorded due process when in the September 14 specifications of charges the F.A.C. made substitutions and additions of which the plaintiffs were not informed in the June 21 letter. Further, it is contended that some of the additional charges arose out of events subsequent to the June 21 letters and that these charges against plaintiffs could not be fairly made in the September 14 specifications of charges. The plaintiffs further assert that the September 14 specifications of charges were vague and in-

adequate and that, being presented only two days before the first hearing, the notice thus given was not timely. The plaintiffs also attack the F.A.C., contending that it was biased and had prejudged the case against them, that it was improper for members of the F.A.C. to testify against them, and that the F.A.C.'s findings were not supported by the evidence. The plaintiffs also contend that they were in fact expelled without a hearing since, when the hearings were held, their purpose was to determine whether to readmit plaintiffs. Finally, the plaintiffs contend that the rules and regulations in the Student Handbook under which they were punished are unconstitutionally vague.

■ The Court is of the opinion that the plaintiffs' contentions concerning the adequacy and timeliness of the notice given are without merit. The specifications of charges of September 14 were precise statements of the accusations against plaintiffs. They were actually more detailed than many indictments presented in courts of law. The transcript of the hearings before the F.A.C., as well as the hearing in this court, demonstrates that the plaintiffs understood fully the nature of the charges against them. In Due v. Florida A. & M. University, supra, a letter was read to the students for the first time at the hearing stating the charge against them. This was the only notice of the charge that the plaintiffs were afforded, yet the court held the notice to be both adequate and timely. In the case before this Court the plaintiffs were first given notice on June 21 that disciplinary action was being taken, and then on September 14, two full days before the first hearing, a detailed specification of the charges against each student was provided. The plaintiffs were fully aware at the hearings of the charges against them. They were in no way prejudiced or handicapped because of inadequate or untimely notice. This case is easily distinguishable from Dixon and Knight in which the school authorities before taking disciplinary action afford-

ed the students concerned no notice or opportunity for a hearing.

■ Further, the plaintiffs were in no way deprived of due process of law because the September 14 specifications of charges included substitutions and additions of which the plaintiffs had not been informed in the June 21 letter, as well as charges arising out of events subsequent to the June 21 letter. As stated above, the September 14 specifications of charges constituted adequate and timely notice to the plaintiffs. Therefore, it makes no difference that the plaintiffs had not been previously informed of these charges in the June 21 letter or on some other occasion. Nor is it material that some of the additional charges arose out of events occurring subsequent to the June 21 letter. If the F.A.C. had reason to believe that the plaintiffs between June 21 and September 14 had engaged in activities for which they should be subjected to discipline, it was not a denial of fundamental fairness for the F.A.C. to include these accusations in the September 14 specifications of charges.

■ With regard to the hearings of September 16, 18, and 20, the facts of this case clearly indicate that the F.A.C. heard all the evidence in considerable detail and that the rudiments of an adversary proceeding were preserved. The facts do not support the plaintiffs' contention that they were denied due process because the F.A.C. was biased or had prejudged the case against them. On the contrary, the F.A.C. not only heard the testimony of plaintiffs and their witnesses, but allowed plaintiffs' counsel to cross-examine witnesses testifying against the plaintiffs. The plaintiffs' hearings were more extensive and more consideration was given to the evidence and charges than the minimum standards set forth in *Dixon* and *Knight* and other cases would exact to satisfy the requirements of due process under the Fourteenth Amendment. At the hearing in this court, University administrators testified that they had attempted throughout the school year to work with these students

to get them on the proper academic path. It was only after the F.A.C. unanimously agreed that rehabilitation was impossible that they were indefinitely suspended.

Nor does the Court believe that the fact that two members of the F.A.C. testified against the plaintiffs is sufficient in itself to constitute a denial of fundamental fairness. To support their contention that a fair hearing was denied because of this commingling of prosecutorial and adjudicatory functions, the plaintiffs rely on the recent case of Wasson v. Trowbridge, supra, in which the plaintiff Wasson sought an injunction restraining his dismissal from the Merchant Marine Academy. One contention raised by *Wasson* was that members of the panel which disciplined him had participated in the investigation against him. This was contrary to the regulations of the Academy. In remanding the case to the District Court for a hearing, which the District Court had refused to grant, the Second Circuit held "that Wasson was entitled to show that members of the panel had had such prior contact with his case that they could be presumed to have been biased."

In this case, unlike *Wasson*, the Court has held a full evidentiary hearing affording the plaintiffs every opportunity to show that members of the F.A.C. were biased against them. The record demonstrates clearly, however, that there was no bias or prejudice on the part of the F.A.C. It has been shown that the F.A.C. sought to reach decisions commensurate with the best interests of both the plaintiffs and the University. The members of the F.A.C., because of their positions, know more about the general activities and events at the University than persons not in positions of authority and responsibility. It is of course the duty of a school administration to be aware of developments at the school and to attempt to solve problems as they arise. There is no violation of procedural due process when a member of a disciplinary body at a university sits on a case after he has shared with other members

information concerning the facts of a particular incident. See Federal Trade Comm'n v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). This limited combination by a school administrative body of prosecutorial and adjudicatory functions is not fundamentally unfair in the absence of a showing of other circumstances, such as malice or personal interest in the outcome of a case.

The Court concurs in the plaintiffs' contention that the findings of the F.A.C. should be set aside if they were not supported by substantial evidence. It would not be consistent with procedural fairness for the Court to sustain findings of a school disciplinary body found to be arbitrary and capricious and not based on substantial evidence. United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); Peoples Bank of Trenton v. Saxon, 373 F.2d 185 (6th Cir. 1967).

There is, however, substantial evidence in the transcript of the hearings before the F.A.C., introduced into evidence in this Court, to support the findings of the F.A.C. against each of the three plaintiffs. With regard to plaintiff Jones, the F.A.C. found that he distributed literature designed to promote unrest on campus. At the hearing before the F.A.C. Mrs. Knight, a cafeteria worker, and Dr. Davis, President of the University, both testified that Jones had passed out a piece of literature signed "SNCC," advocating a student boycott of the University's fall registration. President Davis stated that Jones gave him this literature personally and that he had at least fifty copies in his possession when he did so. Mrs. Knight was able to identify positively this particular document.

The findings of the F.A.C. against plaintiff Booth were that Booth had been arrested and found in bed with a young woman, that he passed out literature and talked and was dressed in such a manner around the library as to disturb other students, and that he had disrupted a meeting of the student body and demon-

strated gross disrespect for University officials. At the F.A.C. hearing President Davis testified that he had on numerous occasions seen Booth disrupting study in the library by talking and wearing white overalls covered with drawings. Miss Bessie Kean, assistant librarian, testified that she had seen Booth in the library building barefooted and wearing overalls and that he had on one occasion threatened to "tear up this damn place." President Davis also testified that at an April 28 nominating convention at the University, Booth, while making a nominating speech, turned and pointed to members of the administration who were present on the rostrum and referred to each of them as "Uncle Tom" and concluded by referring to President Davis himself as "Super Tom." At the request of Booth's attorney, the F.A.C. did not delve into the charge concerning the bed incident because of the presence of reporters at the hearing. The F.A.C. did have in its possession, however, a portion of a transcript from a court proceeding from which the F.A.C. could have inferred that the bed incident did in fact occur.

The findings of the F.A.C. against plaintiff Brooks were that he had on two occasions treated the President of the University with gross disrespect, and that he had disrupted a meeting between faculty and students to such an extent that it could not be continued. Before the F.A.C. President Davis testified that at an April 12 student grievance meeting at the University, Brooks led a group of other students in completely disrupting the meeting and stated to President Davis, "Man, we didn't come here to listen to your lies and empty promises. We came here to eliminate you and tear this joint down." Dean Sawyer at the same hearing testified that he was a witness to this occurrence and that when he told Brooks he should be more respectful toward University administrators, Brooks replied, "Who ever heard of respect in a revolution?" President Davis testified further that upon receiving a message of a death in Brooks' family, he called

Brooks to come to his home in order that he might deliver this message to him. When he arrived, Brooks said, "Man, do you have a message for me?" President Davis then delivered the message to Brooks and told him he knew where he could obtain bus fare home. Brooks replied, "Hell, man, I don't want any bus fare. I travel by plane. I want you to give me a hundred and fifty dollars." At that point Brooks walked toward President Davis and said with pronounced anger, "Hell, man, do I get the hundred and fifty dollars, or don't I?" Dean Payne testified that he was a witness to this event.

As already stated, the Court is of the opinion that this evidence was more than sufficient to support each of the findings of the F.A.C. There was, of course, much other evidence presented at the school hearings concerning the other charges. Evidently the F.A.C. found this evidence insufficient or did not believe it necessary to make a decision on the other charges, or it may have accepted the plaintiffs' explanations of the other charges. This is a further indication that the F.A.C. was not arbitrary or capricious in its action and that it acted in a fair manner at all times.

In their attack upon the findings of the F.A.C., the plaintiffs also contend that the regulations in the University Student Handbook are unconstitutionally vague. The charges against the plaintiffs and the findings of the F.A.C. were stated by the F.A.C. to be in violation of three University regulations: Those prohibiting (1) Disrespect for University authority; (2) Any act in violation of city, county, state, or federal law; and (3) Any other infractions of standards of conduct that require severe disciplinary action. It is these three regulations which the plaintiffs attack.

The Court is of the opinion that no constitutional right of the plaintiffs has been infringed because disciplinary action was taken against them pursuant to these three regulations. Plaintiffs have cited several cases to the effect that "a law forbidding or requir-

ing conduct in terms so vague that men of intelligence must necessarily guess at its meaning and differ as to its application violates due process of law." Baggett v. Bullitt, 377 U.S. 360, 366–367, 84 S.Ct. 1316, 1320, 2 L.Ed.2d 377 (1964). The Court does not quarrel with this well established rule of law but believes that it is inapposite in this case. The plaintiffs here are not attacking a state statute. Rather, the attack is upon student regulations found in a university handbook. No case is cited to this Court in which an attack upon a student regulation as being unconstitutionally vague has been sustained. To fulfill its function of imparting knowledge, a university must of course maintain order on its campus and exclude therefrom those who are detrimental to its well being. A university has inherent general power to maintain order and to formulate and enforce reasonable rules of student conduct. Goldberg v. Regents of University of California, 57 Cal.Rptr. 463 (Cal.App. 1st Dist. 1967). University regulations for students because of the very nature of the institution and its goals and purposes, should not be tested by the same requirements of specificity as are state statutes.

Finally, under their contention that they have been denied due process, the plaintiffs assert that they were in fact expelled without a hearing and that when hearings were actually held, the F.A.C. was considering whether to "readmit" plaintiffs. The plaintiffs make much of the fact that the announced purpose of the F.A.C. in holding the hearings was stated as being whether to "readmit" plaintiffs and that, therefore, the burden of proof was placed upon the plaintiffs to convince the F.A.C. that they should be readmitted.

The objective of the hearings, as stated in the June 21 letters, was to provide the plaintiffs an opportunity to show cause why the action taken against them by the F.A.C. should not be made final. There was no greater burden upon them than there would have been had the University postponed any form of disciplinary action until after formal hearings. In either case the purpose of the hearing is to determine whether the charges are true. Disciplinary proceedings conducted by an educational institution are not to be tested according to the niceties of procedure required in a court of law. Inquiry into the technicalities governing burden of proof in civil or criminal trials is, therefore, irrelevant. This phase of the plaintiffs' argument resolves itself basically into an unfounded argument of semantics brought about by the use of the word "readmit" by the F.A.C. In an administrative proceeding the "demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point * * * so long as the requisite hearing is held before the final order becomes effective." Opp Cotton Mills v. Administrator, 312 U.S. 126, 152–153, 61 S.Ct. 524, 536, 85 L.Ed. 624 (1941). In this case the requisite hearing was held before the final decision of indefinite suspension was made.

In their attack upon the F.A.C. the plaintiffs make the further argument that the F.A.C. has deprived them of equal protection of the law. More specifically the plaintiffs assert that the actions of plaintiffs Brooks and Booth which led to the charges of gross disrespect for University authorities were no different in quality than the actions of other students not selected for punishment. The plaintiffs contend, for example, that James Montgomery, who is now President of the University Student Council, also referred to President Davis as an "Uncle Tom" at the April 12 nominating convention. The plaintiffs further allege that many of the twenty-eight students who received the June 21 letters and elected to contest the proposed indefinite suspension were permitted to continue at the University on the basis of a telephone call and that only in the plaintiffs' cases did the F.A.C. make additional charges subsequent to the June 21 letters. Plaintiffs conclude that the actions of the F.A.C. were taken against

them because the plaintiffs sought the aid of counsel.

The equal protection clause of the Fourteenth Amendment was "intended to secure 'the full and equal benefit of all laws and proceedings for the security of persons and property' and to subject all persons 'to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.' R.S. § 1977, 42 U.S.C. § 1981 (1958 ed.)." McLaughlin v. State of Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 289, 13 L.Ed.2d 222 (1964). Equal protection of the law guarantees against invidious discrimination between persons in similar circumstances. The law may not lay an unequal hand on those who have committed intrinsically the same quality of offense. Skinner v. State of Oklahoma ex rel. Williamson, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). On the other hand, there is no violation of equal protection of the law when a statute or a regulation, or the application or enforcement of either of them, makes a classification that is reasonable rather than arbitrary. Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). In the instant case any action by the F.A.C. made arbitrarily without regard to a reasonable classification would not be consistent with equal protection of the law.

The record before the Court, however, does not support the plaintiffs' contention that they have been arbitrarily and invidiously discriminated against by the F.A.C. While it is true that James Montgomery did refer to President Davis as an "Uncle Tom," there is no evidence or indication that he at any other time was disrespectful toward University authorities. There is in the record considerable evidence that on several occasions plaintiffs Booth and Brooks both treated University officials with gross disrespect. Further, the failure of the F.A.C. to make any additional charges against any of the other students seeking to continue their studies at the University following the June 21 letters

could very well have resulted from the fact that none of the other students engaged in any activities subsequent to June 21 for which they should have been disciplined. There is no evidence that would indicate otherwise. The plaintiffs' contention that they were disciplined because they retained counsel is totally without merit since other students who retained the same counsel as plaintiffs were permitted to continue at the University.

In summary, the record in this case demonstrates that the F.A.C. throughout the crucial period here involved has acted reasonably and in good faith. The facts simply do not support the plaintiffs' contention that the F.A.C. invidiously and arbitrarily discriminated against them. It may very well be that the F.A.C. in the exercise of its discretion decided not to punish other students, but there is no evidence to indicate that the decision to punish plaintiffs and not others was not reasonably and fairly made.

The final contention raised by plaintiffs is that the action of the F.A.C. was taken to discourage or punish the plaintiffs in the exercise of their First Amendment freedoms. The alleged basis for this contention is that they were denied the right to continue their education at the University because they publicly expressed themselves on campus and community affairs.

The right to freedom of speech, along with the other First Amendment rights, is of course an indispensable democratic freedom secured to all by the First Amendment to the Constitution. These freedoms are given a preferred place in our scheme, a priority providing "a sanctity and a sanction not permitting dubious intrusions." Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945). The right to freedom of speech has long been made applicable to the states under the due process clause of the Fourteenth Amendment. Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); DeJonge v. State of Ore-

gon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937).

Plaintiffs in their brief make the assertion that this case deals with speech in its pure or pristine form; that is, that there were no accompanying demonstrations or picketing which could disrupt or delay University proceedings. While it is correct, as the plaintiffs contend, that there were no demonstrations or picketing, the facts compel the conclusion that there was other conduct of the plaintiffs disrupting and undermining University proceedings. For example, as stated above, plaintiff Brooks was found to have said to President Davis, "Man, we didn't come here to listen to your lies and empty promises. We came here to eliminate you and tear this joint down." This statement was made by Brooks at a time when he led several others in completely disrupting a grievance meeting at the University on April 12. This meeting was being held in the aftermath of three days of rioting at or near the University campus, a crucial time in its existence. Clearly such conduct involves a departure from the exercise of free speech in its pure or pristine form. The F.A.C. in each one of the findings concerning speaking or leafletting could justifiably have found from the evidence that the actions of the plaintiffs promoted unrest and disrupted the normal educational activities at the University. The plaintiffs were not punished because they exercised their First Amendment freedoms. The record of this case supports the conclusion that the action of the F.A.C. was in no way an attempt to suppress the plaintiffs' political views but rather was an effort by the F.A.C. to control and regulate conduct obstructing the educational functions of the University.

The Supreme Court has made it clear that conduct such as picketing and parading is subject to regulation even though intertwined with expression and association. Cox v. State of Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). There are many instances in which certain forms of conduct mixed with speech may be regulated or prohibited. The classic example is that given by Mr. Justice Holmes: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). Also, a man may be punished for encouraging the commission of a crime, Fox v. State of Washington, 236 U.S. 273, 35 S.Ct. 383, 59 L.Ed. 573 (1915), and for uttering "fighting words," Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). As the Supreme Court said in Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949), "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language * * *."

The indefinite suspension of the plaintiffs resulted from their obstructive conduct which, just as in the case of picketing and parading, is subject to regulation even though commingled with expression and association. The action of the F.A.C. did not constitute a deprivation of plaintiffs' First Amendment freedoms.

The result which the Court reaches on this issue is similar to that reached in Blackwell v. Issaquena County Board of Education, supra. There the school authorities prohibited students from wearing "freedom buttons" which depicted a black and white hand joined together and the word "SNCC" underneath. The record showed an unusual degree of commotion, boisterous conduct, collision with the rights of others, and undermining of authority as a result of the wearing of these buttons. The court held that the regulation was a reasonable rule necessary to maintain order and that it did not violate the plaintiffs' right to freedom of speech. Cf. Burnside v. Byars, supra.

In concluding that the F.A.C. in the exercise of its power to control student

conduct and behavior has not deprived the plaintiffs of any constitutionally protected rights, the Court is in no way departing from the rule of *Dixon* and *Knight* that due process of law requires notice and some opportunity for a hearing before a student at a tax supported university may be expelled for misconduct. While a state school must comply with these elementary principles of procedural fair play, it is not necessary that a university adopt all of the formalities of a court of law. To achieve its educational goals a university must maintain order, propriety, and discipline. It is axiomatic that the exigencies of university life require the formulation and enforcement of rules of student conduct, and a court of law will not interfere with this function when, as in this case, the university has proceeded in a manner that is fundamentally fair and reasonable.

For the reasons set forth the relief requested in the complaint will be denied and the plaintiffs' action will be dismissed on the merits. This opinion will constitute the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52. Judgment has this day been entered in accordance with this opinion.